May it please the Court, Mr. Chairman, it is an honor to serve under your chairmanship. I'll let everybody just get settled first. Let your opposing counsel get settled in their seat, please. I thought I did. Thank you, Your Honor. All right. Mr. Godet. Billy Godet, representing NASS, L.L.C., the appellant. This case, as the many cases cited in the briefs, require the particular facts and circumstances for all of these issues to be decided on those facts. The facts in this case are very unique and unlike any of the cases cited by UNIC in obtaining summary judgment. We believe that the district court committed several reversible errors, including the judge actually reversed the standard for summary judgment. And by that I mean she accepted the statements of fact given by UNIC in a light most favorable to the defendant, movement, rather than accepting the facts and evidence in a light most favorable to the non-moving plaintiff. It's hard to determine whether the court was relying on the statements of fact and conclusions in the brief or in the record because the court didn't cite to any actual record excerpts or the actual exhibits. The next reversible error is the court made no analysis or discussion of what the insured's duty to provide satisfactory proof of loss. And I believe she put the burden on the insured much greater than an insured is required to prove. If you look at the Judge Vance's decision in the Kiln versus Jesuit case, I think she sets it out very clearly that the insured's burden is only to provide enough facts to put the insurer on notice. In this case, contrary to the very statement by Judge Vance, which he said it's unfair to put the burden on the insured to actually prove the precise damages and cause, that's what happened in this case. The court did not analyze or make any decision on the affirmative duty on the part of the insured to investigate. That's important because in her decision, I think the building block for her decision that the delay was caused solely by the plaintiff and the insured, even though the insurer really didn't make any affirmative independent analysis of its own. One of the problems was that your client kept changing his story as to what had happened. Well, Your Honor, I can respond to that, that in July 2016, the adjuster, Mr. Acosta, saw an invoice from Dr. Shamsnia dealing with the cost by Phillips who sold an MRI to them. He talked to the Phillips engineer, Randy McClain, and what Mr. McClain told him was basically the probable cause of the loss. And this is a complicated case, Your Honor. This is a case where you have an MRI in a $1.7 million MRI in a facility that has special ceilings, special roof, special flooring, a vent pipe, and as admitted by UNIC, it needed an expert engineer to determine this. What I'm getting at is they were apprised by a third-party engineer that the cause of the water intrusion, there was never a doubt that water intrusion did cause damage. Mr. McClain told them that the quench, when you quench an MRI and the helium is at subzero with pressure, the pipe contracts and that caused a gap in the hole in the roof, allowed the water to come in. Well, that's the exact same conclusion that the insurer came up with. The insurer was required to hire experts. He's not an engineer. He's not an MRI facility expert. The insurer had to go to the expense of hiring experts, an MRI facility geophysicist, a material expert, a contractor to provide an estimate, and the architect. Now, what did UNIC do when it received that information? Nothing. From the very beginning, from the very beginning, it knew because of these complicated issues, and it said in letters, we need to hire an engineer expert to determine the cause of the damage and the cause of the loss, right? Did they ever hire an expert? Did they ever hire an expert to look at the very opinions in expert reports? No, they did not. And on that point, let's look at some of the record and the evidence that was produced. One of the positions of the court and UNIC was that the insurer never provided them photographs prior to repairs. June 9, 2016, a letter from Mr. Costa, the definitive adjuster, to Mark Harmon, the claims manager for the insurer. We received five small color photographs. And what those photographs were, pictures of the water damage inside the MRI with notations about where the photos were taken. Later on, Mr. Costa visited the site, and Dr. Shamsian showed him two binders of photographs. Didn't ask to copy them. Dr. Shamsian gave Mr. Costa a video of the quench, meaning from the roof, where you see this ceiling come down hitting the roof, and a video from inside the MRI room which showed the water coming through. What did they do with the videos? There's not a single piece of evidence saying they did anything with those videos. What is your theory as of today as to what caused the damage? Well, essentially, it's the same theory that Mr. McClain told Mr. Costa in July 2016. What happens when you quench, it's 350 degrees minus 450 degrees Fahrenheit. When it comes out of the pipe, it shrinks the pipe. And so what happens is the pipe shrinks as it exits the roof, and a gap is caused as they had heavy rain. That's what Mr. McClain said. That's what the proof of loss to the insurers said. The issue of whether a design fault occurred was never told to plaintiffs. Why does any of that matter? Your client did not file his suit within the two years of prescription. Because it matters, Your Honor, because the cases state that if the conduct, overall conduct of the insured is such to lull the plaintiff into not filing a suit, and here are the factors the court didn't cite. Here are the factors for that. Late request for information, no doubt about that. Prolonged and continuous communication, no doubt about that. Intentional delay. We believe the facts create a genuine fact as to this was an intentional delay. Let me cite a case, Illinois Union v. Louisiana Health Indemnity, cited by Judge Brown. They made the same exact argument, that the insurer did not give them enough damage documentation. Several requests. What did Judge Brown? Judge Brown stated that that's not enough. If I can find the full case. There it is. What Judge Brown found is that Illinois Union failed to fulfill its affirmative duty under 22-1973 to adjust claims fairly and properly and to perform a diligent independent investigation. Illinois Union cannot establish that it did not act in bad faith as a matter of law by showing it took any positive action such as a low standard would conflict with the Louisiana law establishing that an insurer must act with its insured's best interest in mind and that demanding information from an insured does not satisfy Illinois Union's affirmative duty to investigate and adjust claims in good faith. That's the bad faith argument. The court, however, never cited, Kelly, the Louisiana Supreme Court, which expanded the fiduciary duty. The district court only relied on the enumerated duties set forth in the Louisiana insurance statutes, which is not good law anymore. Even the Fifth Circuit in Century v. Blevins, what happened in that case, Judge Height, for the same reasons that Judge Malazzo did, and I have the utmost respect for Judge Malazzo, but I just think that she didn't do a full analysis in this case. And the Fifth Circuit reversed it because he dismissed the bad faith claim for the same reasons that Judge Malazzo stated. They cited Kelly and said there is a duty to protect the interest of the insured instead of your self-interest. Let me go to the facts of that. There was constant we are continuing to investigate. We need more information, okay? Never hired an engineer, never hired a contractor. December 7th letter from Mr. Harmon to Dr. Shamsian. Now, this is weeks before the deadline. What's in that letter? We have hired Rob Carraway, client's attorney, as an attorney to investigate the claim and obtain your examination under oath. This is in the appellate record 973-974. There was no contact of Dr. Shamsian. There was no more investigation. What contains in every letter from COSTA for the four months since October 2016 all the way to January 3rd? Hey, the deadline's coming up on June 15th, 2017. The inference is that they weren't looking at anything. They weren't investigating. They kept asking for information because they were hoping to make Dr. Shamsian think that he was going to settle a case. Are you talking about the Hike case? Pardon? Yes. That's the Fifth Circuit sentry versus Levin's case. But what you were reading from was not this case. No, it was not. It was Judge Hike's case. Sentry was Judge Hike's case. The Illinois Union case that I was reading from is Judge Brown's case. So, Your Honor, in January 3rd, the final letter from — Judge Elrod has a question for you. Pardon? Judge Elrod has a question for you. Oh, I'm sorry. Judge? Thank you. The district court noted that the insurer requested photos of damage and records of repair on ten different occasions. Are you saying that's wrong? I'm saying that they may have requested, but they were provided photographs on several occasions. So you're saying they already had everything they needed and they were not repeatedly asking for the same information? It's my position that they were asking for the same information. They didn't do anything with it. They didn't need it. Regardless, did they have everything already? Regardless of whether they're doing anything with what they have, was there full compliance with the information within the first or second or third or fourth or fifth time of asking? Or does the record reflect that they didn't have the information? The only information they didn't have is photographs of the repairs before they were made. In this case, you have a facility that's expensive, it's got water damage, so the insurer had no option other than quickly repair the damage. So when they told there are no photographs, no such photographs exist, period, go home, I mean, was that promptly communicated? Well, what they didn't do is say there were photographs of the damage, the water damage before the repairs were made. You know, insurer companies have databases. This material, drywall costs this, ceiling costs this. In every one of these cases, they hire an estimate. They have a policy provision in their policy that says within 30 days of receiving the proof of loss, we have to tell you our intention as to whether we're paying or not paying. But they told them that the claim, that they rejected the proof of loss. And so that tells you they're not really pursuing the amicable. No reasonable insurer would have thought that this was going to be an amicable resolution once they rejected the loss and once they're repeatedly asking for the same information. And they've never said we normally pay claims like this. There's none of the positive language in this case like in other cases. There's nothing that would lead a reasonable – what in the record would lead a reasonable insurer to believe other than that it's taking a long time and that's not enough? Because, Your Honor, they led him to believe that he had to prove his damages, he had to prove his case in November 28th. Well, that might – that would be a negative thing, wouldn't it, to make him believe he has to prove – that would not say we're on our way to amicable resolution. That would say we're going to be fighting you every step of the way and we're going to even shift the burden. But in the record, Your Honor, November 28th, Dr. Shamsa sent them all this proof of loss, his extra report, and he says in that I hope now we can have an amicable resolution because he was believing that the delay was due to him not providing this proof of loss that he provided. Let me skip to another issue. Your initial time has expired and you've saved time for everybody. Thank you. Thank you, Mr. Kennedy. Ms. Carraway? May it please the Court. My name is Katie Carraway and I represent United National Insurance Company. The trial court correctly dismissed this case on summary judgment and we would ask that the Fifth Circuit Court of Appeals also affirm that dismissal. This lawsuit was filed too late and UNIC did not waive its right to enforce the time limitation period. There are other reasons why this case should be dismissed. The plaintiff utterly failed to cooperate in the adjustment of the claim and there was no competent evidence that UNIC acted in bad faith. The trial court was absolutely correct on all of those points. Now, in our recitation of the facts, which I'm going to say I know was tedious, but we went through that entire claims file to show the court that, first of all, the insurance claim was filed almost an entire year after the occurrence and NASA already made the repairs to the property. Two, UNIC made multiple efforts time and time again to get information crucial to the adjustment of the claim. Do you agree, though, that under the circumstances it would have been reasonable for the repairs to be made right away so that they could continue to conduct the usual activities of the facility? Perhaps, Your Honor, yes. However, a reasonable insured or reasonable business owner would also have documents of what was damaged, what was repaired, who repaired these items, and how much it cost. We never, ever got any information on any of those things. There were no pictures of the damages. Mr. Bote has said there were three or four pictures that were provided to the insurance company that did show standing water, but no damage. I thought he said there was a whole notebook of pictures. I am not aware of that. That is the first time I'm hearing that there were binders of pictures, and I still haven't seen binders of pictures. So I'm just not aware of that, Your Honor. Also, NASS sent three reservation of rights letters in addition to the 10 or maybe 11 or 12 other letters that were sent to the insured asking for information about what was damaged. Were their walls damaged? Were their floors damaged? Was the carpet damaged? Was sheetrock damaged? That was never given to us. And I'll tell you, after three years after the occurrence and deep into the litigation, well, after the lawsuit had already been filed, on two separate occasions, Plaintiff's Counsel provides hundreds of pages to me that had never been provided to the insurance company prior to this time. I will say that it was a haphazard, and I say chaotic, grouping of documents, and it's very difficult to tell what was actually matched with actual damages that are alleged. But that's the first time we got any information, and that is three years after the occurrence. So to say or to suggest that UNIC was asking for information that had already been produced by the insured during that year of adjusting the claim, it's not accurate. It is not accurate. We received some photographs that showed some standing water on the floor, and that's it.  There were no photographs of the roof before the occurrence or after or before the repair. There wasn't any information given about who repaired anything. I mean, just basic things that an insurer is supposed to, pursuant to the contract of insurance, give to the insurer. Remind us what the record shows about whether there were conflicting or different stories about the cause of the damage. Yes, Your Honor. There was a moving target, actually. Dave Costa testified to that in his deposition that is part of the record, that at first he was told this was a wind event, that somehow the pipe that went through the roof, it's called a vent pipe that vents helium from the MRI machine, that it was damaged by a storm. Then the causation story changed to no. There was some vibration of the machine, and it dislodged the vent pipe coming through the roof and caused some space around the vent pipe on the roof. Then it became, oh, well, the MRI machine should never have been placed in the room where it was placed. It was too close to a wall, and there was too much attraction between the magnetic component of the MRI machine and a steel insert in the wall, and that the MRI machine was actually kind of dancing towards that and could have exploded. Then we were told, well, there should have been brackets that were placed on the floor for this MRI machine, and that that wasn't done by Phillips, the manufacturer of the machine. What would that have to do with the storm damage? We were trying to, it was at first thought by the adjuster that the claim was not covered because it appeared to be not a wind event, but more of a defect in the construction or design or workmanship. And these messages that you were referring to most recently would support that. The documents that we received in terms of some checks and some receipts and what have you, they had nothing to do with what caused it. All of those documents that we received in discovery had nothing to do with the causation of the event. It was all about alleged costs that were expended to repair water damage. Yes, ma'am, did you? But as he said, the reason it's some kind of the way it's constructed, not the wind. I'm sorry, ma'am. Didn't he just say by telling us that it was because it narrows when it gets really cold and all of that, that's a way that it's constructed. That's not the wind or anything, right? Exactly, it is. And we ultimately figured out after the lawsuit was filed, when Phillips finally gave us some photographs, and they weren't a party to this in any way, they're not a party to this case, but we obtained some photographs from Phillips that showed what really happened is that the vent pipe that was constructed through the roof did not comply with just standard construction protocol, that there had not been a proper boot placed around the vent pipe that came out that would have protected it from leaks. So we would have never found that out had we not seen some photographs that were provided after this litigation. So it came back to, yeah, problems with workmanship, problems with construction, problems with design. So UNIC was always very concerned that this is not a covered cause of loss. This was initially considered or reported to be a wind event, but it clearly wasn't. So it was a moving target. Dr. Shamsnia, the principal of NAS, was telling Mr. Costa, you know, talking to him all the time about what happened, how he was going to sue Phillips for a kajillion dollars, and, you know, it just never was very clear what really happened. And us hiring an engineer would have never determined that because the only way we were able to determine what actually happened was when we got some photographs from Phillips that showed that vent pipe on the day of the quench, and that was not provided by NAS, and it was never even mentioned that possibly there was issues. Just to simplify it for me. Okay. We are here on whether the district court correctly applied prescription. Yes, sir. And the only way that Judge Malazzo could have erred in that is if there was something to, as a legal matter, would extend the two years. Yes, sir. I agree. All right. What is it, was any of this relevant to not filing their suit within two years? Your Honor, thank you for putting me on the track that I need to be on, which is to explain to you why there was no express nor tacit action on the part of UNIC that should have led any reasonable insurer to believe that UNIC was waiving its rights to enforce the time limitation provision in the policy. There's multiple case law we've cited to in our briefs that explains that it is within the insurer's right to have a limitation period in a policy, and there is a specific Louisiana statute that says investigating a claim does not waive an insurer's right to assert its claims, you know, assert its, excuse me, its defenses under the policy. And here are just some of the facts that I think are really important here that the courts find important. You will not find in this record that we ever, UNIC, ever told Dr. Shamsny that the claim would be paid. Never admitted liability under the policy. Never told Dr. Shamsny that his claim was covered by the policy. We did not adjust the claim beyond the limitations period. Never told Dr. Shamsny he should ignore the time limitations provision in his policy. Never deprived him of any right to ask questions about his policy. We did not create his apparent ignorance about the terms of his policy. We never misrepresented the time limitation of the policy. Never concealed anything material required to be disclosed under Louisiana law. And never made a partial payment to NAS. It's, Dr. Shamsny has said his subjective belief is that this was going to be resolved, but the, this court has stated that it is an objective, it's the reasonable man standard. What insured would, under these circumstances, three reservation of rights letters saying, there's problems here with coverage. There are problems. We're not waiving our rights. What reasonable insured would hear from the insurance company, we are rejecting your proof of claim in its entirety. What about the letter on December 28th that said that it was looking, quote, looking forward to an amicable resolution? Well, that was from Dr. Shamsny. And, again, I think that that goes to my point I was just trying to make, which is that what he subjectively thought was happening is absolutely not supported by any of the facts. The insurance company just said, we reject your proof of loss in its entirety, and he writes a letter saying, I look forward to an amicable resolution. There was, whether he believed that subjectively, that's not the test for this court to look at today. It's whether there was, whether any of the facts showed that indicated Dr. Shamsny, oh, I'm going to back off and I'm not going to get one of my multiple lawyers that I'm currently working with to even look at this, nor am I going to, you know, I'm going to believe that I just have forever to file this claim. It's unreasonable. The Louisiana law has time and time again said that the insurance policy is the contract of the parties and that it is not the insurance company's fault if an insured decides not to read the policy or not to understand what the terms are in the policy. And this time limitation provision is pretty clear. It's pretty expressed. And it just was ignored by Dr. Shamsny, not due to anything that we did to induce him to ignore it, but he just ignored it. And we're entitled to rely on that provision. We did not waive it. The claim was, the lawsuit was filed three months too late, and we submit that it was too late. The trial court didn't specifically go into this, but we would also like to bring to the Court's attention here today that we also believe relatedly that the plaintiff failed to cooperate in the adjustment of the claim. And there is a case called Johnson v. Giovera Specialty Insurance Company from this circuit. Excuse me. Is this in your brief? Sorry? Yes, sir. It is. We don't need to get into this, do we? This is an alternative backup argument, right? Yes, ma'am. Yes, ma'am. So if you would prefer that I not, I won't. It's your time. Well, I just want to bring that to the Court's attention, that cases have been dismissed for the insured's failure to comply with its obligations under the policy to cooperate. And so I do raise that. I want you to know that that is also a reason why this case is properly dismissed. And finally, there was no competent evidence that UNIC acted in bad faith. The trial court was correct in saying that when an insurer has legitimate doubts about coverage for a particular claim, the insurer has a right to litigate such a questionable claim and that there was no bad faith indicated by the facts in this case. Repeatedly, again, there were requests that, Dr. Shamsnia, please provide us with information. Who did you pay? What were the damages? What were the repairs that were made? None of that was ever given to the insurance company. I mean, just basic information that's needed to adjust a claim. And so Mr. Goday mentions this case, Kelly, that came out of the Louisiana Supreme Court. And I would just like to— Nobody brought that up below, did they? The Kelly case? Yes. I don't believe so, no. I think the Kelly case may have been cited for the first time to this Court. I'm not positive about that. I didn't cite to it, but Mr. Goday did. Well, neither the Court nor the parties brought that up, so it's pretty much waived, isn't it? Well— Even though it's easier than arbitrary and capricious. Well, I would just state that there's a long line of cases in Louisiana that say that the insurance contract is the law between the parties and that the insured is presumed to know the contents of the policy. Kelly doesn't affect that. It doesn't abrogate that well-established Louisiana law, and it doesn't reverse any of those cases that we rely on in our brief that state that there was no obligation on the part of UNIC to tell Dr. Shamsney about the limitation provision in the policy, and there was no obligation on the part of UNIC to tell him what is in the policy. In the reservation of rights letters, UNIC properly and appropriately said, hey, here are the provisions in the policy that we're looking at in terms of coverage that could be a problem for you. Plaintiffs say that we should have also said, and by the way, you have to file a lawsuit by a certain time, and we respectfully submit there's no duty under Louisiana law to tell an insured that he has to file a lawsuit by a certain time. There's no law about that, and that is not bad faith. It's not misrepresenting facts, and it is not anything that should reverse the summary judgment that was properly granted in this case. Thank you, Your Honors. Thank you, Ms. Caraway. Rebottom, Mr. Gaudet. Thank you, Your Honor. May it please the Court. I think we're confusing the bad faith that the Court decided because they sent reservation of rights letter and therefore there's a dispute over coverage. That's not our case. That's not what we're arguing. Yes, we admit that they sent reservation of rights and they were disputing coverage. Our bad faith is their untrue statement that they were, their investigation was ongoing. We did cite the Kelly case, Your Honor, in the motion for summary judgment stage. And so the, that's where the Kelly case comes in because Kelly says that the insurer in a bad faith case, breach of good faith and fair dealing, says that you must protect insured's interest, not your own self-interest. And part of the record I did want to point out that, first of all, the record at 1360 is a letter from Costa saying that Dr. Shamsian showed us two binders of photographs. That's where I got actual record. As for never, the top of the roof, they were given a video of the quench onto the roof, which showed the pipe configuration. Their own expert in litigation couldn't figure it out for a while. And by the way, they hired an expert one month in February 2017 after their limitation period prescribed and before suit was filed. So they did keep it open. Why, I don't know. We found that during the litigation, and we found it odd. Why is it odd? Wouldn't you use the expert to help you to fight the claim? It doesn't mean that you're investigating to pay the claim. The limitation period had expired, and they took the position that it wasn't going to be filed, and they had that defense. Why would they need to hire an expert unless they knew that their investigation was not complete? That's the kind of expert they should have hired during the claim adjustment period to determine the particular circumstances that my client had to hire. It's over, so they don't have to do that anymore. All they have to do is try to hire their expert to show that, if they want to try to show that the client's thing was not caused by what they said or that they have these other issues. I don't understand how that is relevant to your case. Well, it's our argument. It's part of their affirmative duty in this case. They said they need an expert for them to determine what the cause and the amount of damage for this particular MRI facility that had water damage. They told my client they were hiring one. Mr. McClain told them he would be glad to meet with their expert, and they never hired an expert. And therefore, when we were giving them information, they didn't know what to do with them because they didn't have an expert or a contractor with the estimate that we provided them to do an actual estimate that every other insurance company does. How does that excuse the failure to file within two years? Let me explain, because, Your Honor, the courses and, for instance, in Smith v. Metropolitan, in that failure to file issue is different than the bad faith issue. The court did find that the bad faith claim was not prescribed. Bad faith is a little different, somewhat coextensive, but a different claim than the mulling claim. But in the Smith v. Metropolitan case, what happened was the insured, that's 868 Southern 2nd 57, the insured stated that letters from the adjuster telling her to send unpaid repair bills and we will be glad to review them, two letters. What did the court say? Under the particular facts here, a genuine issue of material fact remained on the issue whether representations by an adjuster coupled with the insurer's continued contacts and consideration of her case over a long period of time lulled plaintiffs into believing that the claims she filed were not going to be contested or would be settled without the need for suit. Our case, I think the facts and the record are stronger. But that is the case about lulling. The fact that they didn't offer payment or offer settlement doesn't exclude the lulling claim. All right. Your time now has expired, Mr. Godoy. Your case and all of today's cases are under submission and the court is in recess until 9 o'clock tomorrow.